AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the
Northern District of New York

**UNITED STATES OF AMERICA**
**v.**
**MARION LOPATNIUK,**

**Defendant**

Case No. 1:25-mj-196 (PJE)

U.S. DISTRICT COURT – N.D. OF N.Y.
FILED
Jun 30 - 2025
John M. Domurad, Clerk

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date(s) of April 2025 through June 20, 2025 in the county of Rensselaer in the Northern District of New York the defendant violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. § 1958(a) | Use of Interstate Commerce facilities in the Commission of a Murder-for-Hire |

This criminal complaint is based on these facts:
Click here to enter text.

☒ Continued on the attached sheet.

*Complainant's signature*

Special Agent Brian Jacob, FBI

*Printed name and title*

Attested to by the affiant in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

Date: June 30, 2025

*Judge's signature*

City and State: Albany, NY

Hon. Paul J. Evangelista, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

Special Agent Brian P. Jacob, of the Federal Bureau of Investigation (FBI), being duly sworn, deposes and states:

## INTRODUCTION

1. I respectfully make this affidavit in support of a criminal complaint charging Marion LOPATNIUK with the use of interstate commerce facilities in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958(a).

2. Your affiant has been an FBI Special Agent since February 2003. In 2005, I was assigned to the Safe Streets Task Force (SSTF) in Washington, D.C. where I primarily worked on violent gangs and narcotics matters. In 2011, I was transferred to the FBI's Albany Field Office and assigned to the white-collar crime squad in that office. In June 2020, I became a supervisor of the white-collar crime squad in Albany where I led a team of investigators, analysts, and professional support staff. In November 2024, I voluntarily stepped down as an FBI supervisor and was assigned to the SSTF in Albany. I have been tasked to investigate organized crime, drugs, and violent crimes in the greater Albany area. During my career, I have gained training and experience investigating all types of federal white-collar, violent crime, and narcotics matters.

3. As an FBI Special Agent, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of offenses enumerated in 18 U.S.C. § 2516(1). Accordingly, I am authorized to seek criminal complaints for Title 18 criminal offenses, including violations of 18 U.S.C. § 1958(a). That statute provides in pertinent part that: "Whoever . . . uses or causes another to . . . use . . . any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as

consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value" is guilty of a crime.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. The information contained in this affidavit is not an exhaustive account of everything I know about LOPATNIUK or everything I have learned in this investigation. Rather, it contains only the facts that I believe are necessary to establish probable cause in support of a criminal complaint. Where statements of others are related in this affidavit, they are related in substance and in part and transcriptions of recordings are based on the FBI's preliminary analysis of those recordings.

**PROBABLE CAUSE**

5. In April 2025, your Affiant became aware that Marion LOPATNIUK, an inmate at Rensselaer County Correctional Facility ("RCCF"), was soliciting people to request the murder of his ex-wife's boyfriend ("the Victim"). LOPATNIUK advised he could pay $1,200 up front and would work off the rest of debt after being released from prison. LOPATNIUK and his ex-wife are engaged in a custody dispute related to their shared children. LOPATNIUK also appears to be in arrears on child support payments. Based on recorded jail calls, LOPATNIUK expressed hatred towards his ex-wife and the Victim, and is interested in custody of his children upon his release from prison.

6. On or about April 21, 2025, LOPATNIUK was provided with a telephone number that would resolve to an FBI Undercover Employee ("FBI UCE") posing as a Mexican cartel connection, who could facilitate the Victim's murder. LOPATNIUK was advised that when he called the "hitman," LOPATNIUK will be asked, "Who do you think will win the World Series

this year?" to which LOPATNIUK must respond with "Yankees." This process would help validate the authenticity of the caller to the "hitman," who was the FBI UCE.

7. On May 20, 2025, LOPATNIUK and the FBI UCE had telephonic contact through an unrecorded line at RCCF, though the FBI UCE recorded the call. LOPATNIUK stated that he wanted to "work on some Yankee tickets" if the FBI UCE was able to do that. The conversation continued to use baseball code words to describe conducting the murder. The FBI UCE stated "…we don't sell a ton of tickets, but we sell the best seats if that makes sense." LOPATNIUK referred to meeting a certain baseball player which I understand to mean the Victim. LOPATNIUK stated that he had friends who were not incarcerated who would help pay. When asked about his budget, LOPATNIUK stated that he had $1,200 to start and then he would do some "tree work", "labor", or "remodeling" to work off the rest. LOPATNIUK mentioned he could "jump on the crew and do some things." From this conversation and my knowledge of the case, I understand that LOPATNIUK is looking to pay $1,200 up front for the murder and wanted to work off the remaining debt doing illicit work for the cartel upon release from prison. The FBI UCE told LOPATNIUK to write him a letter providing more information on "where you want to sit, first base line, third base line…" LOPATNIUK then stated he was looking to see if it could get done by Father's Day (June 15, 2025).

8. On May 28, 2025, LOPATNIUK had a call with the FBI UCE from an unrecorded RCCF phone. The call was recorded by FBI UCE. During the call, the FBI UCE asked for LOPATNIUK to "fill in some blanks" related to the murder of the Victim. LOPATNIUK provided the FBI UCE with the Victim's full name, address, age, vehicle, place of work and times of departure from the house. LOPATNIUK requested the murder to occur

outside the house because his kids are in the house. The FBI UCE then asked how LOPATNIUK preferred the murder be conducted, as follows:

FBI UCE: *Now let me ask you this and then, and then, that will be enough for today because we will have to talk again Monday after my guys do some stuff. But are we, are we looking at, umm, how do I want to say this, uhh, you know like uhhh, make it look like something went wrong on the job or, or, you know, never to be seen from again?*

LOPATNIUK: *Never to be seen if possible. I mean, that's the, that's the end goal if possible but you know, whatever you guys…*

LOPATNIUK and the FBI UCE then discussed payment through Cash App. LOPATNIUK stated that a friend of his will provide payment, however the friend believed the payment was for "Yankees tickets." The FBI UCE confirmed that LOPATNIUK will pay $1,200 up front. They then discussed opportunities for LOPATNIUK to work off the remainder of the debt. I understand through this call that LOPATNIUK expressed that he wants the Victim's body to not be found after the murder ("Never to be seen if possible").

9. On June 3, 2025, the FBI UCE had telephonic contact with LOPATNIUK from an unrecorded line at RCCF. The call was recorded by the FBI UCE. The FBI UCE asked LOPATNIUK about the Cash App payment and LOPATNIUK responded that he just needed to know where to send it. The FBI UCE provided a Cash App account to LOPATNIUK. The FBI UCE advised LOPATNIUK that if the sender of the money needed verification, they could text him however they need to understand it is for Yankees tickets. The FBI UCE then asked LOPATNIUK about additional information for the Victim such as a phone number, which LOPATNIUK provided as (***) ***-5872.[1] The FBI UCE advised LOPATNIUK that one of his guys would call that number during surveillance to confirm they have the right guy. During the call, LOPATNIUK stated:

---

[1] Your affiant has confirmed that (***) ***-5872 is a cell phone number utilized by the Victim.

LOPATNIUK: *Yeah, no that's fine. I mean, whatever you guys got to do, you do your job, you know. <Redacted> said you guys are good at what you do as far as taking care of uhhh, remodel work so*

FBI UCE: *Very*

LOPATNIUK: *I do appreciate it.*

The call concluded when LOPATNIUK explained to the FBI UCE that the payment may come from two different sources. LOPATNIUK finished by stating, "*Yeah, no I'm looking forward to it, trust me. I'm trying to get myself geared for it, you know? I'm looking forward to it. Definitely.*"

10. On June 13, 2025, the FBI UCE had telephonic contact with LOPATNIUK from an unrecorded line at RCCF. The call was recorded by the FBI UCE. LOPATNIUK explained that he was still having trouble getting money together. Another call was scheduled for the morning of June 18. LOPATNIUK then explained that RCCF was looking into the law firm associated with the FBI UCE.[2] LOPATNIUK wanted the FBI UCE to know so it did not cause issues with anything going on. LOPATNIUK also wanted to give the FBI UCE a little extra money for the inconvenience. The call continued as follows:

LOPATNIUK: *Last weekend this motherfucker hung up the phone on me while I was trying to talk to him about my kid's birthday on Saturday and I'm trying to talk, like he wanted, my kid wanted me to call him on his birthday and I'm trying to talk to my ex about it and he's like 'no we're not doing that' and hung up the phone. I was like you've got to be kidding me dude.*

FBI UCE: *Really?*

LOPATNIUK: *Yeah, he's, he's a piece of work. He's like you're going to call them Sunday when you're supposed to and that's it and hangs up the phone on me and my kid, the one whose birthday it is, he's very sentimental so now he's going to know I'm in jail and I didn't call him on his birthday. You know so fucking…*

[2] In order to communicate with the FBI UCE on an unrecorded jail line, LOPATNIUK told RCCF that he was speaking with an attorney, which was not true.

FBI UCE: *These fucking guys play games they don't know their place. You know what I mean?*

LOPATNIUK: *Yeah, well, he'll know, he's gonna know. So...*

FBI UCE: *Well, there you go. Yes, he is.*

Based on my experience and knowledge of the case, in this part of the conversation, LOPATNIUK expressed anger and frustration at the Victim ("Last weekend this motherfucker hung up the phone on me while I was trying to talk to him about my kid's birthday on Saturday"). LOPATNIUK then said the Victim is going to know his place, in reference to his being murdered ("Yeah, well, he'll know, he's gonna know. So…").

11. On June 20, 2025, the FBI UCE had telephonic contact with LOPATNIUK from an unrecorded line at RCCF. The call was recorded by the FBI UCE. LOPATNIUK explained that his friend was pushing the money through, and the FBI UCE should receive some payment that day. LOPATNIUK explained that he had sent a friend all the payment information through mail so that it wasn't recorded on a RCCF jail call or tablet message. The conversation continued:

FBI UCE: *And just so you know, I don't, I don't know umm, what <redacted> explained to you but just to kind of reiterate before, like, in order for us to do this, you know, the going street rate is about 20k. So whatever you can get me in cash, like I know you're going to work, you're going to work it off for me uhh when you get out but it's going to be about 18k worth of work. You're good with that?*

LOPATNIUK: *Absolutely. I'm good with whatever I'm definitely very interested in the employment opportunity as well and hopefully a consistent one, you know.*

FBI UCE: *Well so it is consistent I've got multiple kinds of businesses, I've got, you know, this kind of stuff that I'm doing for you, right now, and you know I've got the stuff that Nate does, you know the, the, the you know the distribution stuff. So I don't know what you're more comfortable with or familiar with but, but that, those are kind of the two things I'm thinking you would help out with once you got uhh, once you started working for me. Does, does, one sound bet…, does one sound better than the other or… just so I can get my ducks in a row.*

LOPATNIUK: *Umm, honestly, if umm, I, I would be open to both. Let's just put it that way and then, and if one fits better than the other then that's fine, if both fit in one way shape or form, like I'm open book at this point, like I said I will be happy to have the employment opportunity and then, you know, we can definitely umm, you know, work it out where we can have mutual benefits from both, you know.*

Based on my experience and knowledge of the case, in this conversation, the FBI UCE told LOPATNIUK that the total cost for murdering the Victim was $20,000 ("in order for us to do this, you know, the going street rate is about 20k") and that LOPATNIUK will owe $18,000 to him and the Cartel to which the FBI UCE confirmed LOPATNIUK was in agreement ("when you get out but it's going to be about 18k worth of work. You're good with that?"; "Absolutely."). The FBI UCE then explained that LOPATNIUK could work off the debt through performing murders or selling drugs and asked which interested LOPATNIUK ("Well so it is consistent I've got multiple kinds of businesses. I've got, you know, this kind of stuff that I'm doing for you, right now, and you know I've got the stuff that <redacted> does, you know the, the, the you know the distribution stuff… does one sound better than the other?") to which LOPATNIUK replied that he would sell drugs or commit murder ("Umm, honestly, if umm, I, I would be open to both. Let's just put it that way and then, and if one fits better than the other then that's fine, if both fit in one way shape or form, like I'm open book at this point").

12. On June 20, 2025, the FBI UCE received a $500 payment to an undercover Cash App account from a friend of LOPATNIUK's with whom he was coordinating. This payment was coordinated through LOPATNIUK and was a partial payment for the murder of the Victim.

**CONCLUSION**

13. Based on the foregoing, I respectfully submit that this affidavit establishes probable cause to conclude that Marion LOPATNIUK has violated 18 U.S.C. § 1958(a) (use of interstate commerce facilities in the commission of murder-for-hire).

Attested to by the affiant:

Brian P. Jacob
Special Agent
Federal Bureau of Investigation

I, the Honorable Paul J. Evangelista, United States Magistrate Judge, hereby acknowledge that this affidavit was attested by the affiant by telephone on June 30, 2025 in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

Hon. Paul J. Evangelista
United States Magistrate Judge